# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

In the Matter of the Estate of     )      C.A. No. 2022-0088-LM
JOHN L. O'NEILL     )
    )      and
    )
    )      ROW Folio No. 177444 WF-LM

## MAGISTRATE'S POST-TRIAL FINAL REPORT

Final Report: March 28, 2024
Date Submitted: November 17, 2023

Timothy S. Ferry, FERRY JOSEPH, P.A., Wilmington, Delaware; *Counsel for Petitioner Kathleen O'Neill.*

Jason C. Powell and Thomas J. Reichert, THE POWELL FIRM, LLC, Wilmington, Delaware; *Counsel for Respondent Kevin O'Neill.*

Kenneth O'Neill, Saint Johns, Arizona; *pro se Respondent.*

**MITCHELL, M.**

This case arises from the administration of the Estate of John L. O'Neill. John O'Neill died testate on December 24, 2020, leaving behind three adult children, and two adult grandchildren as beneficiaries of his estate.

After a two-day trial on the merits, I find: (1) Kenneth O'Neill has breached his fiduciary duties; (2) the Respondent should be required to provide an updated accounting and updated inventory, but may continue to serve as the personal representative of the Estate, with specific requirements as further explained herein; and (3) the Petitioner may charge her attorney fees for this litigation to the estate. This is my final report.

## I.     BACKGROUND[1]

The parties' disputes concern the late John L. O'Neill and the administration of his estate (the "Estate"). The Decedent's daughter, Kathleen O'Neill challenges the administration of the Estate by her brother, Kevin O'Neill.

---

[1] The facts in this report reflect my findings based on the record developed at trial on September 13, 2023, and October 3, 2023. *See* D.I. ____.  I grant the evidence the weight and credibility I find it deserves.  Citations to the trial transcripts are in the form "Tr. #." The Parties' jointly submitted exhibits are cited as "JX __."  Certain exhibits proffered at trial and excluded from the jointly submitted exhibits are cited as "Tr. Ex. __."

## A. The Decedent

John L. O'Neill (the "Decedent") died on December 24, 2020.[2] He was diagnosed with dementia and Alzheimer's and died of COVID.[3] At the time of his death, the Decedent owned two (2) real properties: 2821 Fawkes Drive, Wilmington, Delaware 19808 ("Fawkes Property"), and 11 Edinburgh Court, Newark, Delaware 19711 ("Edinburgh Property").[4] The Fawkes Property and the Edinburgh Property (together the "Two Properties") are just a couple of miles away from each other.[5] The Decedent and his wife spent their lives living in the Edinburgh Property.[6] However at the time he died, the Decedent was a resident at Serenity Gardens Assisted Living in Middletown, Delaware.[7]

## B. The Parties[8]

The Decedent was survived by three out of four of his biological children: Kathleen O'Neill (the "Petitioner"), Kevin D. O'Neill (the "Respondent"), and Kenneth O'Neill ("Kenneth"); and two biological grandsons: Kyle O'Neill ("Kyle")

---

[2] D.I. 62 at ¶1.

[3] Tr. 52:20 – 53:3.

[4] D.I. 62 at ¶7.

[5] Tr. 125:3-6.

[6] Tr. 326:20 – 327:1.

[7] D.I. 62 at ¶7.

[8] I use first names for Kenneth, Kyle, Cory, and Krystin to avoid any confusion as everyone has the same last name; I intend no disrespect or familiarity.

and Cory O'Neill ("Cory"); and one granddaughter: Krystin O'Neill ("Krystin" and Petitioner's daughter). The Petitioner and the Respondent had a strained relationship for most of their lives.[9] In fact, the parties have not communicated since the Respondent called the Petitioner when their dad died.[10] Currently, the parties only communicate through their counsels.[11] The Petitioner, through her counsel, has made at least forty attempts to communicate with the Respondent about their father's Estate, but the Respondent has been unresponsive.[12]

### C. Administration of the Estate

The Decedent died testate with a Last Will and Testament ("Will") dated October 15, 1990.[13] The Will devised the Decedent's entire estate equally to his children, per stirpes, and nominated the Respondent as Executor.[14] The Respondent was granted letters testamentary on April 19, 2021.[15] In accordance with the letters testamentary, an inventory was due on or before July 19, 2021. The accounting was due on or before April 19, 2022.[16] Respondent filed, and was granted an extension

---

[9] Tr. 386:22 – 388:6 (the parties have not communicated since Petitioner was five years old).

[10] Tr.385:18-21.

[11] Tr. 120:17-22.

[12] Tr. 442:9-16.

[13] *Id.*

[14] *Id.*

[15] ROW D.I. 3.

[16] *Id.*

to file the inventory by September 19, 2021.[17] Nonetheless, the inventory was not filed until June 30, 2022,[18] with an amended inventory filed on July 1, 2022.[19] A first accounting was filed on May 25, 2023, but was not docketed due to an incorrect calculation on the last page of the inventory.[20] As such, an amended first accounting was filed on June 1, 2023.[21] On September 5, 2023, the Petitioner filed exceptions to the first accounting, however they have not yet been heard.[22]

### a. The Edinburgh Property

The Edinburgh property was in danger of foreclosure and the Decedent's estate needed funds.[23] When conducting the inventory, the Respondent realized the estate was insolvent.[24] The Edinburgh Property was sold in July 2022.[25] It sold for $525,000,[26] and netted approximately $173,000 in proceeds from the sale.[27]

---

[17] ROW D.I. 5.

[18] ROW D.I. 10.

[19] ROW D.I. 12.

[20] ROW D.I. 15.

[21] ROW D.I. 24.

[22] ROW D.I. 25

[23] Tr. 84:7-9; Tr. 228:21 – 229:7.

[24] Tr. 104:9-14.

[25] Tr. 258:2-3.

[26] Tr. 82:7-9.

[27] Tr. 230:6-15.

When the Respondent filed the first inventory, it listed the Petitioner, the Respondent, Kenneth, and equal shares between Cory and Kyle as owners of the Two Properties.[28] When the Respondent filed an amended inventory a week later, he changed the owner of the Edinburgh Property to himself allegedly to sell the Edinburgh Property.[29] After Petitioner commenced this action, the Respondent reached out to a realtor to assist with the sale of the Edinburgh Property.[30] The home sold within approximately three months and none of the beneficiaries in the Will were involved with the sale.[31] The beneficiaries have not yet received any of the proceeds and have agreed the proceeds should be held pending this litigation.[32]

The settlement statement for the sale of the Edinburgh property shows that Brian Frederick Funk, P.A. ("Mr. Funk"), the attorney who conducted the sale, currently has $300,000 in escrow to settle the mortgage of the Edinburgh property.[33] The settlement statement also indicates that there is an amount of $173,103.91 as "Remainder held in Escrow to Brian Frederick Funk, P.A."[34] The Respondent has

---

[28] Tr. 228:10-18.

[29] Tr. 229:22 – 230:8.

[30] Tr. 82:10 – 83:13.

[31] Tr. 83:23 – 84:2.

[32] Tr. 89:2-21; Tr. 314:2-317:19.

[33] Tr. 85:5-18; Tr. 86:1-3.

[34] Tr. 86:22 – 87:7.

not received any updates from Mr. Funk about the payoff of the mortgage of the Edinburgh Property or additional escrow.[35] Mr. Funk is holding the proceeds in escrow until this lawsuit is closed.[36]

### D. Bank Accounts

The accounting mentions three bank accounts: two Artisans' accounts and a Voya Financial Plan ("Voya Account").[37] The combined total of the three accounts was $47,451.59.[38] Although the three accounts are listed in the inventory, the Respondent claims to be the sole beneficiary to the two Artisans' accounts.[39] One of the Artisans' accounts amounted to $4,589.24 while the other amounted to $17,172.20.[40] No documentation was presented to confirm that the Respondent is the only beneficiary of those accounts.[41] However, none of the interested parties have raised this issue as a claim in this litigation.

There are two estate accounts; one with DEXSTA Federal Credit Union ("DEXSTA Account") and the other is with the Respondent's counsel ("Counsel

---

[35] Tr. 230:16-19.

[36] Tr. 231:5-9.

[37] Tr. 90:5-8.

[38] Tr. 90:9-10.

[39] Tr. 90:14-22; Tr. 91:17-20.

[40] Tr. 91:17-20.

[41] Tr. 448:4-21.

Account").[42] The Decedent's Voya Account belongs to the estate.[43] The funds from the Voya Account were put into the Counsel Account.[44] The DEXSTA account is comingled.[45] It contains moneys from the Artisans' accounts, allegedly the Respondent's sole inheritance, the Respondent's death benefit from the State of Delaware, and moneys from the sale of decedent's personal property.[46] The Respondent debited $2,261.00 from the DEXSTA Account on August 13, 2022, to retain counsel for this lawsuit.[47] The DEXSTA Account was also used to pay Liberty Mutual to insure the Two Properties and a 2006 Mitsubishi Eclipse (the "Car").[48] The Decedent also had IRA accounts at Charles Schwab and PNC.[49]

### E. Miscellaneous Personal Property

The Decedent's personal property was sold through an estate yard sale and online via Facebook Marketplace.[50] The Respondent had an estate sale during the summer

---

[42] Tr. 92:8-15.

[43] Tr. 91:21-23.

[44] Tr. 91:21–92:7-15.

[45] Tr. 119:18-20.

[46] Tr. 119:13-17; Tr. 113:3-14.

[47] Tr. 160:18-23.

[48] Tr. 161:8-14; The Car is valued at $2,200, and it is currently located at the Respondent's residence. Tr. 93:19 – 95:3; Both the Respondent and the Petitioner have expressed interest in the Car. Tr. 96:11-13; Tr. 233:23-234:5.

[49] Tr. 124:12-14.

[50] Tr. 311:23 – 312:2.

of 2022 at the Fawkes Property.[51]  There, the Respondent with assistance from his wife, Theresa, sold some of the Avon bottles, furniture, lamps, stainless steel shelving, and extension cords.[52] The Respondent conducted these sales without offering any of the personal property to the other beneficiaries of the Decedent's Will.[53] The first accounting indicates that personal property sold at the estate sale totaled $486.00.[54]

The Respondent's wife helped sell other miscellaneous property online, via Facebook Marketplace, which amounted to $686.00.[55] The miscellaneous personal property in the inventory consists of coins, jewelry, and furniture, which totals $6,433.37[56]  The Respondent hired Frank McCraghan to appraise the items sometime after the Petitioner filed her petition.[57]

Petitioner was unaware of both the online estate sale and the yard sales.[58]  The online sales were not reflected in the accounting.[59] The sum of the estate yard sale

---

[51] Tr. 110:11-15.

[52] Tr. 306:19 – 307:7.

[53] Tr. 101:12-19.

[54] Tr. 110:5-8.

[55] Tr. 111:22 – 112:6.

[56] Tr. 97:10-18.

[57] Tr. 97:20 – 98:8.

[58] Tr. 347:10 – 350:15.

[59] Tr. 112:1-11.

and online sales, were kept in a safe in the Respondent's home before it was deposited in the DEXSTA Account two months before the hearing on October 3, 2023.[60]

The Respondent does not have a list of the items sold at the estate sale or the items from the online sales.[61] When the Decedent died, he owned jewelry such as cufflinks, watches, and a compass.[62] He also had his wife's jewelry which consisted of a ruby ring, diamond earrings, pearl earrings, yellow diamonds, necklaces, bracelets, and sapphires from a war in Germany.[63] The Decedent had two safe deposit boxes and only the Respondent had access to them.[64]

## F.    Procedural Posture

Petitioner filed this action on January 27, 2022 seeking removal of the respondent as executor.[65] The petition alleged that Respondent failed to marshal and gather the assets of the estate, including but not limited to tangible personal property;[66] that Respondent failed to communicate with Petitioner's counsel with regard to the

---

[60] Tr. 113:12-21.

[61] Tr. 179:18-23.

[62] Tr. 335:7-13.

[63] Tr. 335:14 – 336:2.

[64] Tr. 338:10-19.

[65] D.I. 1.

[66] *Id*. at ¶ 16.

administration of the estate;[67] and that Respondent had not taken any action to remove Kenneth from the two parcels of real property subject to the estate.[68]

Respondent filed his Answer and both a counterclaim against the Petitioner and a cross claim against Kenneth on April 25, 2022.[69] The counterclaim against the Petitioner alleged, in part, that Petitioner and her agents were unduly influencing their father who was suffering from Alzheimer's.[70] Respondent's counterclaim claimed that in the last few years of Decedent's life, Petitioner exploited Decedent's weakened intellect and begun taking over his financial affairs to enrich herself. He also sought declaratory judgment that Kathleen was unfit to serve as a successor executrix of Decedent's estate. The crossclaim sought contribution and liability for Kenneth's frustration of Respondent's efforts to administer the estate. Kathleen field her Answer on May 16, 2022.[71]

On June 10, 2022, Kenneth O'Neill motioned the Court for an Enlargement of Time.[72] He claimed to have been living "off the grid" and not received

---

[67] *Id*. at ⁋ 17.

[68] *Id*. at ⁋ 18.

[69] D. I. 6.

[70] *Id*. at ⁋ 47-49.

[71] D. I. 10.

[72] D. I. 11.

information regarding the matter, he requested a reasonable time to respond.[73] Counsel for Respondent indicate to the Court that he had no objection to Kenneth's request.[74]  Master Griffin granted Kenneth's request.[75]

On August 18, 2022, Respondent filed a Motion for Default against Kenneth for his counterclaim because Kenneth had not yet responded.[76]  A hearing was scheduled for September 27, 2022, at 2:00 pm, on the matter.[77]  At approximately 10:30 am that day, Kenneth submitted his Answer along with crossclaims against the Respondent for undue influence, declaratory judgement that both Respondent and Petitioner were unfit to serve as administrator to the Estate, a crossclaim against Respondent for any damages relating to the delay in filing of the inventory for the Estate, costs of repairs to the Fawkes Drive property, and attorney's fees.[78]  Because Kenneth filed a response, the Respondent withdrew his motion around noon that day, so no hearing was held.[79]

---

[73] *Id.*

[74] D. I. 12.

[75] D. I. 13.

[76] D. I. 14.

[77] D. I. 15.

[78] D. I. 17.

[79] D. I 19.

On December 14, 2022, this case was reassigned to me.[80] On January 25, 2023, counsel for Respondent requested a teleconference regarding scheduling in this matter.[81] Counsel for Plaintiff responded shortly thereafter.[82] Included in his response was a motion to bifurcate the issue of removal with the counterclaims and crossclaims.[83] I granted a stipulated briefing schedule on the motion to bifurcate on February 9, 2023.[84] Following a telephonic hearing on the matter, I subsequently granted in part the motion on March 8, 2023.[85]

Kenneth and the Respondent engaged in motion practice between July 2023 and August 2023.[86] On August 30, 2023 we held Oral Argument on two pending motions and a Pre-Trial conference.[87] Kenneth did not show at the hearing.[88] On September 7, 2023, Respondent motioned for default against Kenneth again.[89] This time it was granted.[90] On September 13th I held an Evidentiary hearing on the

---

[80] D. I. 20.

[81] D.I. 21.

[82] D. I. 22.

[83] *Id.*

[84] D. I. 25.

[85] D. I. 35, 36, 38.

[86] D. I. 50-64.

[87] D. I. 69.

[88] *Id.*

[89] D. I. 71.

[90] D. I. 74 (September 13, 2023).

bifurcated matter of removal of the executor. We ran out of time and added a second date for a few weeks later.[91] We continued the hearing on October 3rd and the parties agreed to submit post-trial summations simultaneously within three weeks.[92] This is my Post-Trial Final Report.

## II.  ANALYSIS

Pursuant to 12 *Del. C.* § 1541(a), the Court of Chancery may remove an administrator or executor who neglects their official duties. An executor of a decedent's estate has many statutory duties. Under 12 Del. C. § 1905 (a), the executor is required to file an inventory within three months of the granting of the letters testamentary from the Register of Wills. Under section 2301, the executor must submit an accounting to the court "every year from the date of their letters until the estate is closed… ." Under section 2302, with each accounting filed, the executor must provide notice to each beneficiary of the estate.

Perhaps fundamental to the administration of an estate, Delaware law maintains that an executor of an estate stands in the position of a fiduciary.[93] As such, an executor of an estate owes both a duty of care and a duty of loyalty to the

---

[91] D. I. 75; D.I. 77.

[92] D. I. 90.

[93] *Vredenburgh v. Jones*, 349 A.2d 22, 32 (Del. Ch. 1975) (citing *Downs v. Rickards*, 1872 WL 2132, at *8 (Del. Ch. Mar. 1, 1872)).

14

estate and to the beneficiaries of the estate.[94] An executor is held to a standard of care that requires him to exercise "ordinary care, prudence, skill and diligence" in carrying out her duties.[95] The duty of loyalty requires the executor "to act, at all times, in the best interests of the estate."[96]

## A. The Respondent Breached his Duty of Care to the Estate.

With respect to an executor's duty of care, Delaware case law indicates that the law imposes a strong emphasis on "diligence in all aspects of estate administration."[97] Though often glossed over in the estate administration context, as opposed to the close attention the duty of care receives in the corporate fiduciary context, the duty owed by an executor is to execute its statutory duties and whatever other duties as may be prescribed by decedent's will with ordinary care under the reasonable person standard.[98] In particular, the same care that a prudent person would exercise in her own affairs.[99] Accordingly, the law requires an executor to

---

[94] *Wanamaker v. Wanamaker*, 2024 WL 416498, at *3 (Del. Ch. Feb. 5, 2024); *In re Est. of Newton*, 2023 WL 3144700, at *3 (Del. Ch. Apr. 28, 2023).

[95] *Id*. (quoting *Est. of Chambers*, 2020 WL 3173032, at *2 (Del. Ch. June 12, 2020)).

[96] *Id*.

[97] *Madden v. Phelps*, 1995 WL 606318, at *13 (Del. Ch. May 15, 1995), *aff'd*, 671 A.2d 870 (Del. Ch. 1995).

[98] *In re Spicer's Est.*,120 A. 90, 92 (Del. Orph. 1923) ("…which is now generally held to mean that which would be exercised by an ordinarily prudent and careful man in the management of his own affairs under similar circumstances…").

[99] *Id*.

marshal, inventory, and possess all the decedent's estate, collect any income from the decedent's estate, manage the estate, contest any erroneous claims against the estate, pay and discharge out of the estate all expenses of administration, taxes, charges, claims allowed by the court, or such payment on claims as directed by the court, render accurate accounts, make distributions, and do any other things as directed by the court or required by law under the terms of the will.[100]

Respondent breached his duty of care by failing to properly administer his father's estate. Respondent failed to timely inventory the estate, he failed to gain access and safeguard the personal property of the estate, and he failed to timely pay bills for the estate. First, I will address the timeliness of the estate's inventory. Respondent opened the estate on April 19, 2021.[101] The first inventory was due in three months on July 19, 2021.[102] Like sometimes is the case, on July 19th, he requested an extension for filing the inventory. The Register of Wills ("ROW") granted the extension, giving Respondent an additional two months to complete the first inventory for the estate.[103] Despite the extension, the Respondent failed to file

---

[100] *See generally* 12 Del. C. §§1901-1912, 2101-2109, 2301-2357, 2701-2719, and 2901-2915; *See also In re Spicer's Est.*, 120 A. at 92.

[101] Folio 177444, D. I. 3.

[102] Folio 177444, D. I. 5.

[103] Folio 177444, D. I. 5.

the inventory until nine months later, on June 30, 2022[104]—five months after Plaintiff's counsel entered an appearance on the ROW docket[105] and this petition to remove was filed[106].

Respondent also failed to gain access to the estate, thereby failing to safeguard the property in the estate. Respondent claims he was unable to conduct a proper inventory and monitor personal property at the Edinburgh and Fawkes properties because his brother, Kenneth, held the only keys to the homes and continued to deny him access.[107] Because of Kenneth's behavior, he had no real way to know if there are missing items from the estate. At trial, Petitioner described in detail and provided a pictured list of items she believed were missing from the homes when she was allowed access to the homes to retrieve personal property.[108] While most of those pictures were from, some 25 years ago, and it would be difficult to determine if those items were missing for some other unrelated reasons, I do find that Respondent's failure to gain access to the homes contributed to his inability to identify estate property and creates ambiguity within the estate inventory.

---

[104] Folio 177444, D. I. 10.

[105] Folio 177444, D. I. 8.

[106] D. I. 1.

[107] Tr. 210: 1-18.

[108] Tr. 330:9-333:6; Tr. 341:3-12; see Tr. 35:11-14; Tr. 188:11-192:10; Tr. EX. 663-668.

The Respondent's choice to not remove Kenneth, was like the executrix in *In the Matter of the Estate of Rose ("Rose")*. In *Rose,* one of the beneficiaries, the grandson of the decedent, moved into the real property and refused to allow anyone to enter.[109] The property needed to be sold in accordance with the will. The executrix consulted with counsel but ultimately decided not to remove the beneficiary from the real property and waited until it was sold, which is when he voluntarily left.[110] This Court held that "[a]s a fiduciary, [the executor's] obligations included taking care of the Property and taking appropriate actions to remove [a beneficiary] from the Property.[111]

Similar to the Executrix in *Rose,* the Respondent failed to take appropriate action with respect to Kenneth's occupation of the Two Properties. While I empathize and understand that Petitioner may have attempted to avoid conflict with his brother and was, at times, under the advice of counsel, Respondent was aware that he could have taken action to remove his brother, but chose not to do so.[112] This choice left him unaware whether property was missing, making it impossible to know what if anything Kenneth took from the properties. For example, Respondent

---

[109] *IMO Estate of Rose,* 2019 WL 2996887 (Del. Ch. July 9, 2019).

[110] *Id.*

[111] *Id.* at *6.

[112] JX at 648; Tr 210:20-213:16 (discussing the October 8th email and how evicting Kenneth would have been the "hard way").

noted that after he gained access to his father's home, that there was a pile of stuff left in the basement and only a twin bed left in the master bedroom.[113] Respondent's decision not to take action regarding the Two Properties, resulted in a loss of property (and potentially value) to the estate.

## B.     The Respondent Filed an Incomplete Inventory.

As explained above, when a personal representative files an inventory, it must contain, among other things "an inventory of all goods and chattels of the decedent[.]"[114] The first accounting identifies $486.00 sold at an estate sale. Prior to conducting that estate sale, Respondent testified that he noticed items were missing from his father's home.[115] Respondent and his wife later sold personal property from the estate online via Facebook Marketplace and by conducting a yard sale.[116] Neither Respondent nor his wife kept track of any of those items he sold.[117] While the first accounting says the sales yielded $484.00, Respondent subsequently indicated that both sales yielded $646.00. Further, when asked how the Respondent

---

[113] Tr. 184:12-21.

[114] 12 *Del. C.* § 2301(a).

[115] Tr. 239:18-23.

[116] Tr. 112:3-6.

[117] Tr. 179:21-23; Respondent's wife Theresa, who helped him sell items on Facebook Marketplace testified that she didn't "recall anything" she helped sell on the internet marketplace. Tr. 309:17-21.

valued the property to be sold, he responded that they "just guessed."[118]  The Respondent did not keep a list of the items sold, nor did he document prices he sold them for.[119]

The instant dilemma is like that in the *Estate of McDowell*.  In *McDowell*, the executrix failed to itemize household goods on her inventory and instead used a flat estimate of $500.00, which did not itemize or account for property gifted, sold, or trashed.[120]  A beneficiary filed exceptions based on undervaluation and the executrix argued "the items were not valuable enough to warrant appraisal. The cost of appraising such property would only deplete the estate."[121]  Vice Chancellor Longobardi found that the executrix failed to meet her duty to provide a complete inventory.[122]

The executrix in *McDowell*, thus, was "ordered to conduct a new inventory of all items . . . in her possession[,]" and "directed to have the items she has stored appraised and sold and to apply the amount received to the other assets of the estate."[123]  As to the items already sold, the executrix was required "to list any and

---

[118] Tr. 111:13-16.

[119] Tr. 111:13-19.

[120] *In re Est. of McDowell*, 1983 WL 103268, at *1 (Del. Ch. Aug. 5, 1983).

[121] *Id.* at *1,

[122] *Id.* at *3.

[123] *Id.* at *3.

all proceeds received from the sale of those items as assets of the estate."[124]  And for those discarded, trashed, or gifted, those items were also required to be listed on the inventory with "a detailed description of each and . . . some reasonable value [assigned] to each."[125]  From there, beneficiaries could then challenge the valuations.

Like the executrix in *McDowell*, the Respondent will be required to file a new inventory listing all items of personal property.  Any items still in the Respondent's possession should be appraised, sold, and added to the estate account to the extent it's not an item to be given to one of the beneficiaries. Items already sold should be listed with a sale price, or closest estimate for the items where the sale price can't be recalled.  If there were items given or thrown away, they should be assigned a reasonable value and contain a notation regarding to whom, if anyone, they were given to or when and where they were disposed of.  All interested parties can file exceptions to the new inventory.  Further, although the Respondent can be removed for his breaches of his duty as explained above, I decline to remove him as doing so may further interrupt the administration of this estate.

### C.    Respondent should be surcharged in the form of a reduced commission.

"A surcharge is, essentially, a sanction … requiring the [executor] to fund (or refund) the estate because [he] improperly or poorly handled the estate, engaged in

---

[124] *Id.*

[125] *Id.*

self-dealing, or improperly depleted estate assets. The sanction of a surcharge is not appropriate, though, when the fiduciary's failings are harmless or justified under the circumstances. Further, surcharges are normally tailored to remedy the specific harm caused, rather than to punish[.]"[126] Petitioner requests a surcharge to remedy Respondent's mismanagement of the estate. Applicable here, is the late fees[127] associated with the Respondent's lapse on the bills of the estate and the estate's missing personal property.[128] Respondent allowed the mortgage on both homes to lapse and car insurance on one of the vehicles to lapse.[129] At trial, he acknowledged that this caused the estate to incur late payments for that time.[130] Moreover, the first and only accounting on the docket negates these additional expenses. Accordingly,

---

[126] *In re Estate of Clark*, 2019 WL 3022904, at *7 (Del. Ch. July 9, 2019).

[127] Respondent allowed the mortgage on both homes to lapse and car insurance on one of the vehicles to lapse. Tr.193:12-15; Tr. 161:20-162:8. At trial, he acknowledged that this caused the estate to incur late payments for that time. Tr. 193:12-15; Tr. 161:20-162:8. Moreover, the First and only accounting on the docket negates these additional expenses.

[128] The issue of missing personal property was raised by the Petitioner. I do not find she met her burden to establish that all items from her list were missing from the estate following her father's death. But I do find it is more likely than not that some items are missing from the estate because of Respondent's lack of documentation regarding the personal property that was sold, and Kenneth's occupation of the Two Properties. The latter is supported by Respondent's own admissions in deposition testimony that there were, at least, "golf clubs," that were missing from the estate when Kenneth vacated the Edinburgh and Fawkes properties. JX E at 86:4-6.

[129] Tr. 193:12-15; Tr. 161:20-162:8.

[130] Tr. 193:12-15; Tr. 161:20-162:8.

the Respondent shall be surcharged 50% of any commission he was to take from the estate.

Commissions represent "compensation to the personal representative for his own services in collecting the assets, checking into and paying bills, and performing the various duties which may be necessary, and his trouble and [i]ncidental expenses incurred thereby." [131] Because the personal representative did take steps to administer the estate by, for example, working with his counsel to finalize and file an inventory and accounting, I find that eliminating any commission is not reasonable. However, as noted above, the personal representative's actions caused the estate to incur several late fees. In addition, it was the personal representative's decision not to evict Kenneth, and to allow Kenneth to occupy two houses simultaneously that lead to the depletion of estate personal property. Although the personal representative takes pride in his actions of obtaining a default judgment against Kenneth, these same actions, or lack thereof, led to the need to obtain the default judgment. So, as a surcharge for this mismanagement the executor's commission will be reduced by 50%. [132]

---

[131] *In re Whiteside*, 258 A.2d 279, 282 (Del. 1969).

[132] My recommendation to reduce the commission by 50% does not preclude any interested party from objecting to the reasonableness of the commission under the Court of Chancery Rule 192 when the personal representative submits a request to the Register of Wills.

### D.    Attorney fees.

The Petitioner also requests for her attorneys' fees to be paid from the estate. The American Rule dictates that each party is responsible for its own legal fees.[133] This Court does however recognize several exceptions allowing fee shifting, including the bad faith conduct of a party to the litigation[134] and where fees are authorized by statute or common law.[135] It is not unheard of for this Court to shift attorney fees in estate administration and will contests.[136]  To justify a shifting of fees onto the estate, the circumstances must be "exceptional" and demonstrate "special equities which would make a failure to shift the burden onto the estate unfair."[137]  Attorney's fees for beneficiaries challenging the administration of the estate can be assessed against the estate if their challenges are made on good grounds and serve to "potentially benefit the estate as a whole by ensuring that it will be administered in the manner intended by the testatrix."[138]  Here, I find there were exceptional circumstances as the Petitioner's actions action birthed the forward

---

[133] *Arbitrium (Cayman Is.) Handels AG v. Johnston,* 705 A.2d 225, 231 (Del. Ch. 1997).

[134] *Id.*

[135] *See, e.g.,* 10 *Del. C.* § 348(e); *In re Pusey*, 1997 WL 311503, at *4 (referencing a body of case law that permits exceptants to have their attorneys' fees and expenses covered by the estate if the exceptions benefited the estate).

[136] *IMO Estate of Rose,* 2019 WL 2996887, at *7 (citing *In re Tunnell & Raysor, PA v. Truitt*, 1997 WL 257440, at *1 (Del. Ch. May 9, 1997).

[137] *Id. (citing Scholl v. Murphy*, 2002 WL 31112203, at *3 (Del. Ch. Sept. 4, 2002)).

[138] *Id.*

motion on the administration of the estate. It is unclear how long Kenneth would have occupied the Two Properties but for this litigation. It is unclear, if and when, the Respondent would have filed the inventory but for this litigation. Moreover, the Petitioner's litigation provided the Respondent the opportunity to file his cross claim against Kenneth, that resulted in the default judgment that will benefit the Estate. As such, I recommend the Petitioner's attorney's fees incurred up to the date of this Final Report, for the litigation related to the Petition to Remove the Executor, be paid from the estate.

## III.   CONCLUSION

For reasons further explained above, the Respondent shall stay in his position as executor for the sole purpose of submitting a final accounting in accordance with the above rulings. The Respondent shall prepare a new inventory as specified herein, which may be subject to future challenges, and the parties shall bear their owns costs and attorneys' fees for those future challenges. The Respondent's new inventory must be filed within thirty (30) days of this becoming an order of the Court. Any exceptions thereto would need to be filed under Court of Chancery Rule 197.

This is my Final Report, and exceptions may be filed under Court of Chancery Rule 144.